# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JANE DOE** | |
| **and** | |
| **JANE ROE.** | Civil Action No. |
| *Plaintiff*s, | |
| **v.** | |
| **UNITED STATES OF AMERICA,** | |
| SERVE: | |
| Federal Tort Claims Act Section | |
| Tort Branch, Civil Division | |
| U.S. Department of Justice | |
| 950 Pennsylvania Ave. NW | |
| Washington, DC 20530-0001 | |
| | |
| U.S. Attorney's Office | |
| Civil Process Clerk | |
| 555 Fourth St. NW | |
| Washington, DC 20530 | |
| | |
| U.S. Attorney General Bondi | |
| U.S. Department of Justice | |
| 950 Pennsylvania Ave. NW | |
| Washington, DC 20530-0001 | |
| | |
| **and** | |
| | |
| **BETH REESE, in her individual capacity,** | |
| Bureau of Prisons | |
| Central Office HQ | |
| 320 First Street, NW | |
| Washington, DC 20534 | |
| *Defendants*. | |

## COMPLAINT

### INTRODUCTION

1. Officer Harrison, a known sexual predator, used his position as a correctional officer at FTC Oklahoma City to sexually abuse and harass prisoners under his control, including Plaintiffs Jane Doe and Jane Roe.[1]

2. Despite reports across the Bureau of Prisons and at FTC Oklahoma, BOP leadership continued allowing sexual predators, like Harrison, unfettered access to sexually abuse vulnerable women in their custody and control.

3. BOP leadership, including Defendant Beth Reese, had actual and constructive knowledge of the rampant sexual abuse across the BOP and failed to implement any systems congruent with policy in order to protect those in its care.

4. As a direct result of these failures, Plaintiffs Doe and Roe were sexually assaulted and threatened with retaliation and violence if they were to report the abuse.

5. Plaintiffs Doe and Roe each suffer from ongoing trauma because of the sexual violence, mental torment, and retaliation they suffered, including symptoms such as insomnia, chronic nightmares, anxiety, flashbacks, and depression.

6. Plaintiffs bring this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided to them by various personnel, including Harrison, and the Officer of Internal Affairs, within the scope of their employment with the BOP. Plaintiffs seek redress for Defendants' unlawful conduct,

---

[1] Plaintiffs are concurrently filing a motion to proceed under pseudonyms for fear of retaliation.

which caused them to suffer permanent and catastrophic injuries and which could have and should have been prevented.

7. Plaintiffs also bring this suit under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), in connection with Defendant Reese, as Chief of the Office of Internal Affairs ("OIA"), failing to protect Plaintiffs from reasonably foreseeable predators such as Harrison despite constructive knowledge of his predation, and thereby participating in, and facilitating, the harboring and transportation of Plaintiffs for the purposes of sex induced by force and coercion, and benefiting by continued employment through the BOP.

## JURISDICTION AND VENUE

8. This action involves claims arising under United States and District of Columbia laws. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1346(b)(1), 1367, and 1343(a)(4).

9. Venue is proper in this district under 28 U.S.C. § 1391 because acts or omissions giving rise to the claims occurred in this district, and under 28 U.S.C. § 1391(3) because the individual Defendant is subject to this Court's personal jurisdiction.

## PARTIES

10. Plaintiff Doe was at all times relevant here incarcerated in BOP facilities, including FTC Oklahoma City, located at 7410 S. MacArthur Blvd., Oklahoma City, OK 73169. She is currently incarcerated at FMC Carswell.

11. Plaintiff Roe was at all times relevant here incarcerated in BOP facilities, including FTC Oklahoma City, located at 7410 S. MacArthur Blvd., Oklahoma City, OK 73169. She is no longer in BOP custody, but remains on supervised release. She resides in Texas.

12. The Defendant United States of America ("United States") is liable for the tortious acts of its employees in accordance with the FTCA and is the appropriate Defendant for Plaintiffs' claims under the FTCA. The United States is a sovereign entity that has waived immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

13. The BOP is a component of Defendant United States's Department of Justice. The BOP operates and is in possession and control of the Federal Transfer Center Oklahoma City ("FTC Oklahoma"). FTC Oklahoma is a correctional institution that houses male and female offenders and parole violators who have yet to be assigned to a permanent prison facility.

14. At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters, including at FTC Oklahoma, and responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including, but not limited to, Officer Harrison and Defendant Reese, and the operation of the Office of Internal Affairs, which is supposed to investigate staff misconduct.

15. Defendant Beth Reese is Chief of the Office of Internal Affairs for the BOP.

16. She has held that role since May 2018.

17. Her duty station is in the Central Office in Washington, DC.

18. As chief of the Office of Internal Affairs, Ms. Reese is tasked with overseeing and properly responding to allegations of staff misconduct.

19. She has responsibilities for ensuring that investigations conducted by her office move forward and are completed in a timely manner.

20. These responsibilities include, but are not limited to, training and policy development regarding the office's handling of sexual misconduct allegations, reviewing retaliation allegations and determining whether to have a local investigator or someone from the Central Office further review the matter, reviewing local allegations and referring it to the appropriate local OIG field office, and tracking and maintaining awareness of investigations handled by the OIG.[2]

21. While acting and failing to act as alleged herein, Defendants had complete custody and total control of Plaintiffs.

22. Plaintiffs were dependent upon Defendants for their personal security and necessities.

23. In performing the acts and omissions contained herein, Defendants, and each of its employees, acted under color of federal law, and each acted maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiffs. Each of them knew or should have known that their conduct, attitudes, actions, and omissions were, and are, a threat to Plaintiffs and to their constitutionally, statutorily, and common law protected rights. Despite this knowledge,

---

[2] Transcript of Evidentiary Hr'g at 25, 28, 37, 59, 61, *Cal. Coal. for Women Prisoners v. United States of America Fed. Bureau of Prisons*, (2024) (No. CV 23-04155-YGR).

Defendants failed to take steps to protect Plaintiffs and to ensure their rights to safety from sexual assault.

24.   Defendants are liable for the tortious acts of its employees as well as the negligent failure to properly investigate. At all times relevant hereto, each Defendant was the agent, representative, or employee of each other Defendant. At all times relevant hereto, each Defendant, as well as Officer Harrison, was acting within the course and scope of said alternative agency, representation, or employment and was within the scope of their authority, whether actual or apparent. At all times relevant hereto, each Defendant was the authorized agent, partner, servant, or contractor of each other Defendant, and the acts and omissions herein alleged were done by them acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of the United States and Defendant Reese. Accordingly, each of them is jointly and severally liable to Plaintiffs.

**DEFENDANTS KNEW OF, AND FAILED TO PROPERLY ADDRESS, SEXUAL VIOLENCE RAMPANT ACROSS THE BOP**

25.   Sexual abuse by correctional officers and other prison staff at BOP facilities in the United States has been documented for decades.

26.   In 1999, Amnesty International published a report titled "*Not part of my sentence: Violations of the human rights of women in custody*."

27.   That Amnesty Report detailed:

>        Many women in prisons and jails in the USA are victims of sexual abuse by staff, including sexually offensive language; male staff touching inmates'

breasts and genitals when conducting searches; male staff watching inmates while they are naked; and rape.[3]

28.   The Amnesty Report was widely circulated and read by responsible corrections professionals.

29.   Yet, sexual violence continued to plague the BOP with little to no systemic response intended to curtail the abuse.

30.   Over the past decade, BOP opened 5,415 cases of sexual abuse by BOP employees, of which 586 were substantiated. [4]

31. The true number of assaults that occurred over this period is likely far worse than records indicate because many prisoners don't report sexual assaults for fear of retaliation.

32.   An investigation by the Associated Press published in 2021 documented that over a hundred federal prison workers had been convicted or arrested for crimes since 2019, including a drug treatment specialist at Kentucky prison medical center who threatened prisoners' lives if they didn't comply with sexual abuse. [5]

33. The AP reporting also uncovered the Justice Department's failure to adhere to standard practice by not removing or suspending a prison official tasked with investigating staff misconduct, who was the subject of complaints and arrests himself.[6]

---

[3] Amnesty International, *Not part of my sentence: Violations of the human rights of women in custody,* available at https://www.amnesty.org/en/documents/amr51/001/1999/en/.

[4] Staff Report, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf at 18.

[5] Michael Balsamo, *Workers at federal prisons are committing some of the crimes*, Toronto Star, Nov. 14, 2021, https://www.thestar.com/news/world/united-states/workers-at-federal-prisons-are-committing-some-of-the-crimes/article_e52cd284-d095-5caa-8e5f-90173c580ffd.html.

[6] *Id.*

34. In July 2022, a DOJ working group was tasked to address "reported and proven sexual misconduct by Federal Bureau of Prisons ('BOP') employees" by reviewing the DOJ's approach to monitoring and deterring employee sexual misconduct and looking at the "hundreds of [incidents of] sexual abuse perpetrated by its employees over the previous five years."[7]

35. The working group noted long-standing, pervasive problems throughout the BOP, including insufficient reporting mechanisms, "flawed investigations," and examples of "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[8]

36. Additionally, it determined that changes to the "culture and environment in BOP facilities" were needed to address the rampant sexual violence.[9]

37. The working group found that "advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator."

38. The working group found that "formerly incarcerated individuals reported that corrections officers have threatened retaliation against reporting individuals, including by restricting access to children."

---

[7] The Principal Associate Deputy Attorney General Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, Nov. 2, 2022, https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf (Working Gp. Rep.).

[8] *Id*.

[9] *Id.*

39. One particular problem it found was that, until the early 2020s, "SIS officers were encouraged during initial intake interviews to obtain from victims sworn declarations in writing under penalty of perjury, presumably for a later administrative investigation."

40. This practice was a problem because "[t]here is no legal requirement for sworn statements or affidavits, and the evidentiary value of these sworn affidavits may be limited. At the same time, requiring such sworn statements runs counter to trauma-informed practices and may chill reporting, as it heightens a victim's fear that she may face prosecution if her account is not believed."

41. Finally, the working group noted the problems created by blind spots in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'"[10]

42. The working group also issued elementary guidance regarding establishing an appropriate tone about sexual misconduct at BOP facilities: "The Director of BOP should issue a message reiterating the gravity of sexual misconduct and expressing that sexual misconduct will not be tolerated."[11]

43. The implication of this guidance, given the ongoing and rampant abuse within BOP, is that this message had not been communicated to BOP staff.

---

[10] *Id.*

[11] *Id.*

44.   Additionally, the working group recommended that the BOP develop an "early warning system" in order to detect signs that staff may be engaged in sexual conduct and to identify abusers with a history of abuse.

45.   This recommendation again suggests that the BOP was not analyzing the data it did have, allowing sexual predators to move from unit to unit without any systemic tracking or identification.

46.   Had the working group's suggested changes, which flowed directly from the BOP's statutory and common law duties to the prisoners, been in place before 2021, Plaintiffs likely would have been saved from these frequent, violent assaults.

47.   In October 2022, the DOJ Office of the Inspector General ("OIG") issued a Management Advisory Memorandum detailing its concerns over how the BOP had been handling administrative misconduct investigations and prisoner statements relevant to those investigations. [12]

48.   The OIG specifically noted that "[t]he BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates." [13]

49.   The OIG further noted that the BOP's procedures had historically created a problem because "to the extent that the BOP's reluctance to rely on inmate testimony is known to its

---

[12] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[13] *Id.*

employees, this reluctance likely emboldens miscreant staff members in their interactions

with inmates because such staff members may act without fear of disciplinary

consequences."[14]

50.   The report explained that the "OIG has serious concerns that the BOP is reluctant to rely

on inmate testimony in administrative misconduct investigations, has a general practice of

avoiding calling inmates as witnesses in MSPB and arbitration proceedings, and, at least in

matters involving staff-on-inmate sexual assault, is effectively requiring significantly more

proof than necessary under the applicable preponderance of the evidence standard to

sustain misconduct and take disciplinary action against BOP employees."[15]

51. In sum: "The OIG concluded that this manner of handling misconduct by BOP employees

is contrary to federal regulations and BOP policy and creates significant risks for the BOP."[16]

52.   Over the last three years, more evidence of sexual abuse in the BOP has surfaced.

53. In 2022, a jury convicted a former prison warden at another federal facility afflicted by

allegations of abuse, FCI Dublin, of sexually abusing three prisoners from 2019 through

2021 and of making false statements to a government agency in the investigation of criminal

acts. Separate from the warden's own sexually abusive behavior, eight FCI Dublin

correctional officers were charged with abusing prisoners during this warden's tenure.[17]

---

[14] *Id.*

[15] *Id.*

[16] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[17] *Press Release, Office of Public Affairs, U.S. Dept. of Justice, Former Federal Prison Warden Sentenced for Sexual Abuse of Three Female Inmates, Mar. 22, 2023,*

54.    In 2022, the United States Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs found that the BOP's Office of Internal Affairs had, at the time of publication, a backlog of 8,000 allegations of employee misconduct, some pending for over five years.[18]

55. The BOP did not systematically use the data it had to analyze and prevent sexual abuse of wards, even though the law requires it.[19] "[S]ave for an ad hoc review, the BOP does not ascertain whether the number of sexual abuse allegations at a specific facility or region is trending or part of a larger pattern." [20]

56. Though the PREA standards require the BOP to "collect accurate, uniform data for every allegation of sexual abuse" and "review the data collected to identify problem areas and take corrective action on an ongoing basis," BOP officials admitted they do not analyze complaint data to identify employees who are repeatedly alleged to abuse prisoners, facilities with an outlier number of complaints, or broader system-wide issues." [21]

57. In 2024, the court in the Dublin class action found that "the Bureau of Prisons has proceeded sluggishly with intentional disregard of the inmates' constitutional rights despite being fully apprised of the situation for years." [22]

---

*https://www.justice.gov/opa/pr/former-federal-prison-warden-sentenced-sexual-abuse-three-female-inmates.*

[18] Supra note 3. at 4.

[19] *Id.* at 22-23.

[20] *Id*. at 23.

[21] *Id*. at pp. 22-23 (quotations cleaned up).

[22] *Cal. Coal. for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 719 (N.D. Cal. 2024) (cleaned up).

58.  In deciding to appoint a Special Master, the Northern District of California determined that the BOP had knowledge of the sexual abuse at BOP facilities and that leadership of the BOP "has been, and is, deliberately indifferent to plaintiffs' risk of abuse."[23]

59. The Court made that determination because of the delays in action by the BOP Central Office, including, and especially, Defendant Reese, who first received complaints of sexual abuse from FCI Dublin in 2019, yet did not start prosecuting these cases until 2021.[24]

60.  In 2024, a Special Master Report unearthed a series of deficiencies at the California facility, some of which "are likely an indication of systemwide issues within the BOP, rather than simply within FCI Dublin."[25]

61. The report's findings detailed the failures of the central BOP office, including "the failure of Central Office and Regional Office management to correct significant and longstanding deficiencies that had previously been idenfied [sic] in multiple audits and investigations."[26]

62.  The Special Master also found that "management's failure to ensure staff adhered to BOP policy put the health, safety and liberty of AICs [adults in custody] at great risk for many years."[27]

---

[23] *Id.* at 736.

[24] *Id.*

[25] Wendy Still, *First Report of the Special Master Pursuant to the Court's Order of March 26, 2024*, June 5, 2024, https://static1.squarespace.com/static/64a5d4d138199b2c7c48c3de/t/66d361045918c670b861f4a f/1725128967464/FCI+Dublin%2C+Special+Master+Report+%28No+Attachments%29.pdf.

[26] *Id*.

[27] *Id*.

63. The Special Master found "numerous operational, policy, and constitutional violations" across the BOP, including the failure of the Central Office.[28]

64. The Special Master also reported that the BOP had "no standard protocol to report violations."[29]

65. The Special Master also noted that the BOP-wide data showed less than a 2% acknowledgement rate for Administrative Remedies, which was "difficult to justify."[30]

66. The Special Master also found that the "BOP does not use PREA or other data to monitor reports of assault."[31]

67. Further, in a May 2025 report focusing on FMC Carswell, the Special Master found that, at that specific facility, "staff, in general, have difficulty comprehending what constitutes a sexual abuse or PREA complaint."[32]

68. Specific examples included five Dublin class members at Carswell who reported they had tried many times to file PREA complaints, and a woman who was observed by male and female officers while she underwent a vaginal hysterectomy. The original investigating

---

[28] *Id.*

[29] *Id.*

[30] *Id.* at 10.

[31] *Id.*

[32] Wendy Still, MAS, Senior Monitor California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al., Consent Decree Case No. 4:23-cv-04155-YGR, 2nd Public Monthly Status Report May 1 - 31, 2025, 55, https://rbgg.com/wp-content/uploads/FCI-Dublin-Case-4-23-cv-04155-YGR-May-2025-Monthly-Consent-Decree-Report-FINAL-July-29-2025.pdf.

officer found no action was warranted, even though policy dictates that it should have been referred to the Office of Internal Affairs.[33]

69.    The Report also found that: "Additionally, there appears to be a basic misunderstanding regarding the role of the PREA Compliance Manager and staff at FMC Carswell regarding the requirement that a sexual abuse complaint be logged, documented, and forwarded to the investigative level."[34]

70.    In another required report, the Special Master found that PREA Compliance Monitors ("PCMs") at each BOP facility, "appear to lack the full scope of training and knowledge the Orientation Guide mentions. These deficiencies appear to contribute to the lack of a safe environment for Class Members at these facilities. Furthermore, PCMs assume this role on a rotation basis, with little training provided by BOP."[35]

71.On September 29, 2025, the United States Government Accountability Office (GAO) released a report titled "Bureau of Prisons: Strategic Approach Needed to Prevent and Address Employee Misconduct."[36] The GAO found that, between October 2013 and February 2025, the BOP Office of Internal Affairs opened 86,193 cases and complaints of employee misconduct.[37] While that number includes all employee misconduct allegations,

---

[33] *Id*. at 56.

[34] *Id*.

[35] Wendy Still, MAS, Senior Monitor California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al., Consent Decree Case No. 4:23-cv-04155-YGR, 1st Quarterly Status Report, March 31 – June 30, 2025, 22, https://rbgg.com/wp-content/uploads/FCI-Dublin-Case-4-23-cv-04155-YGR-1st-Quarterly-Report-March-31-June-30-2025-FINAL.pdf.

[36] Report, https://www.gao.gov/assets/gao-25-107339.pdf.

[37] *Id*., p. 28.

BOP investigated more sexual abuse allegations than any other category, except for the introduction of contraband.[38] Further, the fourth-most investigated category was inappropriate relationships, which "could involve [BOP] employees engaging in inappropriate sexual relationships with subordinates or showing partiality toward incarcerated individuals."[39]

72.   In short, the long history of the Defendants' mismanagement created the conditions that led directly to Plaintiffs being raped and sexually abused by a BOP staff member who had a history of sexually violating prisoners under his care, and who, had Defendants systematically monitored, as they should have per their responsibilities, would have been terminated or otherwise removed from his position of power.

73. This mismanagement existed in the face of binding regulations requiring the contrary.

74.   Binding PREA regulations, which apply across the BOP, mandate staff reporting, where all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a) (emphasis added).

75. When an incarcerated person is subject to a substantial risk of imminent sexual abuse, the BOP shall take immediate action to protect that person. *See Id.* § 115.62.

---

[38] *Id.*, p. 43.

[39] *Id.*

76. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a).

77. The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *See id.* § 115.76(b).

78. Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83.

79. Defendants had countless opportunities to follow those mandates and stop Harrison's misconduct. Harrison's actions, including, but not limited to, engaging in frequent sexual abuse of Plaintiffs, as well as the openness with which he used sexual language and mannerisms with Plaintiffs, were obvious and suspicious for sexual misconduct.

80. Even so, Defendants took no actions to investigate or stop this suspicious and recurrent behavior.

81. There are at least four additional survivors of Harrison's abuse who reported Harrison, though that number is likely higher.

82. These additional survivors were digitally penetrated by Harrison, forced to perform oral sex on him, or forced to have oral sex performed on them.

83. Likewise, at least two witnesses reported Harrison's pervasive sexual abuse at FTC Oklahoma.

84. Defendants were aware of these four additional survivors and the two witness reports.

85. Defendants failed to investigate, discipline, supervise, monitor, question, or stop Harrison, despite numerous indications of sexual misconduct including, upon information and belief, from other incarcerated women or from these Plaintiffs themselves.

86.   This violated mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

87.   This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, Defendant Reese, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face, and is the direct and proximate cause for Plaintiffs' damages.

### THE BOP ALLOWED OFFICER HARRISON TO SEXUALLY ABUSE PLAINTIFFS AND OTHER PRISONERS

88.   In April 2022, Plaintiff Jane Doe was incarcerated at FTC Oklahoma City.

89.   She was housed in a unit supervised by Harrison.

90.   Harrison hired some prisoners in his unit as orderlies, a position that gave them additional freedom.

91.  The position also offered Harrison the ability to be alone more often with women prisoners in his office.

92.   Because of the isolation Harrison's job offered, and Defendants' knowledge of the propensity for sexual violence occurring within BOP facilities, Defendants should have exercised more oversight.

93.  Harrison had a practice of offering perks to women prisoners, including watching television in his office, additional time out of their cells, and bringing in outside food and other contraband for them.

94.   In exchange, Harrison demanded sexual contact.

95.  Following the unwanted sexual contact, Harrison threatened consequences if the women reported the abuse.

96.    The women feared potential retaliation, including time in the Segregated Housing Unit ("SHU"), loss of privileges, loss of good-time credit, and physical threats to themselves and their families.

97. Harrison hired Plaintiff Doe as an orderly in April 2022.

98.    Beginning in April 2022, shortly after she was hired, Harrison began sexually abusing Plaintiff Doe.

99.    Specifically, Harrison forced Plaintiff Doe to stand in his office while he penetrated her vagina with his fingers.

100.   Harrison forcibly penetrated Plaintiff Doe on numerous occasions.

101.   Following this abuse, Harrison threatened Plaintiff Doe and her children's safety if she told anyone what he did to her.

102.   Harrison continued to sexually abuse Plaintiff Doe into May 2022.

103.   In the middle of April 2022, a prisoner, Ms. A., arrived at FTC Oklahoma.

104.   Around April 25, 2022, Ms. A. saw another prisoner performing oral sex on Harrison.

105.   Harrison knew that Ms. A. had seen him sexually abusing this prisoner.

106.   After being caught, Harrison ordered the unit locked down.

107.   In retaliation, Harrison began withholding food from Ms. A. and encouraging other prisoners to harass her.

108.   Toward the end of May, after experiencing nearly a month of retaliation by Harrison, Ms. A. reported the incident to Warden Kristi Zook.

109.   Warden Zook told Ms. A. to tell SIS what she saw.

110.   When Ms. A. reported the incident to SIS, the agents told her to "go back in there and be quiet."

111.   After reporting the incident to SIS, Harrison was the one who walked her back to the unit. During this walk, Harrison threatened her: "Think about what you are doing. I run this unit."

112.   Neither SIS nor Warden Zook undertook an investigation or report, or caused an investigation or report to be commenced.

113.   Similarly, neither OIA nor Defendant Reese caused an investigation or report to be commenced nor took any other action.

114.   Harrison continued to have unfettered access to women in this unit.

115.   Likewise, Ms. A. continued to be forced to interact with Harrison, against whom she had filed a PREA report.

116.   As such, Harrison's harassment of Ms. A. escalated.

117.   In April 2022, Plaintiff Roe arrived at FTC Oklahoma.

118.   After Plaintiff Roe arrived at FTC Oklahoma, she was housed in a freezing cold cell during a COVID lockdown.

119.   Plaintiff Roe wanted a room change, and another prisoner told her to approach Harrison because "he's cool and he likes pretty girls."

120.   Another prisoner told her that giving Harrison "attention" could convince him to approve her room change.

121.   Initially believing this just meant talking, Plaintiff Roe approached Officer Harrison about moving her.

122.  When showing him her cold hands, Harrison had Plaintiff Roe touch and rub his thighs and penis to "warm up," and afterwards enabled her room change request.

123.  Harrison's abuse of his position of authority then continued and intensified, particularly after he hired Plaintiff Roe as an orderly.

124.  He would "forget" to lock Plaintiff Roe's door to enable repeated sexual acts.

125.  His demands became increasingly degrading and explicit over time, progressing to ordering Plaintiff Roe to masturbate naked and penetrate herself for his viewing.

126.  Out of fear, Plaintiff Roe complied with these sexual demands.

127.  Ultimately, Harrison digitally penetrated Plaintiff Roe vaginally without her consent.

128.  Harrison's sexual abuse of Plaintiff Roe occurred throughout May and June 2022.

129.  Other prisoners who were aware of Officer Harrison's sexual abuse of Plaintiff Roe physically assaulted her, believing that she was receiving special treatment.

130.  Several other prisoner witnesses did ultimately report Harrison's behavior to Defendants, but Defendants failed to properly investigate or otherwise reprimand Harrison, allowing him continued access to those under his custody and control.

131.  Additionally, Warden Zook's and SIS's failure to respond to Ms. A.'s reports confirmed to Plaintiffs Doe and Roe that they were unprotected and would not be believed.

132.  Even without having actual notice of sexual abuse, officers and other staff would have been able to see Harrison taking Plaintiffs Doe and Roe, and others, for extended periods of time, alone, to his office.

133.  Further, officers and other staff would have seen Harrison bringing in outside food and other contraband for prisoners.

134.   This should have given officers and other staff notice that inappropriate conduct was occurring.

135.   Yet no staff member made a report or investigation.

136.   Given the obviousness and frequency with which Harrison sexually abused Plaintiffs and others, other BOP personnel suspected, or should have reasonably suspected, that he was sexually abusing prisoners.

137.   Defendant United States and its agents, servants, contractors, and employees had numerous opportunities to follow those mandates and stop Harrison's misconduct. Harrison's actions were abnormal, obvious, and suspicious for sexual misconduct.

138.   In addition, upon information and belief, correctional officers in the control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras.

139.   These officers saw or should have seen that Harrison frequently disappeared into unmonitored areas with prisoners who were not authorized to be in those areas alone with an officer.

140.   Even so, BOP personnel took no action to investigate or stop this suspicious and recurrent behavior.

141.   When Plaintiff Doe finally reported the sexual assault on July 20, 2022, the DOJ did not issue its report until after it fired Harrison, nearly two years later, in May 2024.

142.   Defendants and its agents, servants, contractors, and employees failed to investigate, discipline, supervise, monitor, question, or stop Harrison despite numerous indications of sexual misconduct, including reports by other incarcerated women.

143.  Defendants and their agents, servants, contractors, and employees had actual and constructive notice that Officer Harrison's office could be used as a site of sexual abuse.

144.  That said, no BOP personnel came to investigate, intervene, or inquire as to Harrison's interactions with Plaintiffs Doe and Roe, or others.

145.  This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

146.  Because of Harrison's sexual abuse, Plaintiff Doe has suffered from PTSD, anxiety, humiliation, hopelessness, feelings of isolation, and nightmares in which she is forced to relive the trauma.

147.  Because of Officer Harrison's sexual abuse, Plaintiff Roe has suffered from severe emotional trauma requiring psychological intervention.

148.  The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiffs' health and safety, Defendants' disregard of the excessive risk of harm to Plaintiffs' health and safety, and/or Defendants' negligent failure to promptly protect Plaintiffs from foreseeable assaults. Plaintiffs also suffer from other permanent injuries and deficits that will be established through expert consultation in this litigation.

149.  Upon information and belief, Plaintiffs will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiffs' injuries and damages are permanent and will continue to severely impact their health, welfare, and daily functioning.

**EXHAUSTION**

150.  Plaintiffs have properly complied with 28 U.S.C. § 2675 by presenting Administrative

Claims against the United States of America. The Claims were timely filed within two years

of the accrual of the causes of action, at the date at which each plaintiff reported the abuse.

151.  Plaintiff Doe filed her Administrative Complaint on April 15, 2024, and BOP

acknowledged receipt on April 24, 2024.

152.  More than one year later, on June 10, 2025, BOP denied Plaintiff Doe's claim, indicating

that the investigation failed to reveal any evidence supporting her claim, and providing six

months from this date to initiate a lawsuit.[40]

153.  Plaintiff Roe filed her Administrative Claim on February 27, 2024, and BOP

acknowledged receipt on March 12, 2024.

154.  Plaintiffs have exhausted the requisite administrative remedies.

**CAUSES OF ACTION**

**COUNT I – NEGLIGENCE UNDER FEDERAL TORT CLAIMS ACT
(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

155.  Plaintiffs repeat and incorporate by reference every allegation contained in the preceding

paragraphs as if fully set forth above.

156.  At all relevant times, Defendant United States, individually or through its agents,

servants, contractors, and/or employees, undertook and endeavored to, and did provide

custodial care to people incarcerated at FTC Oklahoma, including, but not limited to, the

Plaintiffs.

---

[40] This denial came only after Plaintiff Doe filed for compassionate release.

157.   At all relevant times, Defendant United States acted negligently in its indifference to Plaintiffs' safety.

158.   At all relevant times, Defendant United States hired correctional and administrative employees at FTC Oklahoma, including Harrison, as well as colleagues and supervisors of Harrison whose identities are currently unknown to Plaintiffs.

159.   At all relevant times, Defendant United States's employees were acting within the scope of their employment, in their official uniforms during work hours, performing work duties, when exercising custodial care, control, and supervision over Plaintiffs.

160.   At all relevant times, FTC Oklahoma personnel held themselves out to incarcerated individuals as personnel with the ability and knowledge to carry out their duties, provide due care, and act in accordance with standards of reasonable care common and acceptable in the community.

161.   At all relevant times and within the scope of their employment by Defendant United States, the above-named and unknown staff, while working within their official capacities at FTC Oklahoma, owed a duty to Plaintiffs while they were at FTC Oklahoma.

162.   It is Defendant United States's duty to maintain, operate, and control FTC Oklahoma as a safe and secure space for persons in it, including, but not limited to, Plaintiffs.

163.   In addition to a custodial duty owed to Plaintiffs, Defendant United States of America was statutorily obligated under the Prison Rape Elimination Act and BOP policy to protect prisoners from foreseeable harm that included the sexual abuse suffered by Plaintiffs.

164.   Defendant United States should have known that Harrison had a propensity to sexually abuse inmates.

165.  Defendant United States should have known that Harrison acted inappropriately with prisoners under his care at FTC Oklahoma.

166.  Defendant United States was on notice of the possibility that prisoners would be sexually abused by corrections officers and other facility staff, through the above-mentioned investigations, articles, lawsuits, and reports.

167.  As such, there was a foreseeable risk that correctional officers would sexually abuse Plaintiffs and others under their control.

168.  Despite actual and constructive notice of Harrison's abuse, agents, servants, contractors, and/or employees of Defendant United States did not exercise reasonable care or take reasonable available measures to abate the risk of sexual abuse to Plaintiffs, and to ensure their safety, in violation of federal regulations and BOP protocols.

169.  Despite actual and constructive notice of Harrison's abuse, Defendant United States failed to create and implement procedures, training, and supervision that would protect prisoners from the foreseeable risk of harm, including sexual abuse.

170.  Defendant United States knew of or should have known of the risk posed to Plaintiffs and other prisoners that they would be sexually assaulted by employees such as Officer Harrison.

171.  Despite actual and constructive notice of Harrison's abuse, Defendant United States failed to maintain its facilities in a manner to deter the possibility of sexual abuse, including the above-mentioned lack of video cameras and the availability of unmonitored and isolated spaces in the facility wherein male officers could be alone with female prisoners.

172.   Due to Defendant United States's herein described acts and omissions, it breached its duty to protect Plaintiffs and other prisoners from the reasonably foreseeable harm of sexual abuse by its employees, including Harrison.

173.   Agents, servants, contractors, and/or employees of the United States did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiffs from foreseeable harm.

174.   Agents, servants, contractors, and/or employees of the United States neglected to apply the skill they did have.

175.   Agents, servants, contractors, and/or employees of the United States did not use reasonable care in applying the skill they had.

176.   Agents, servants, contractors, and/or employees of the United States mistreated Plaintiffs and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiffs are not yet aware.

177.   Plaintiffs' injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, and through no fault or want of care or contributory negligence on the part of Plaintiffs.

178.   The failure of FTC Oklahoma personnel to prevent, investigate, or acknowledge Harrison's sexual abuse served no legitimate policy purpose. On the contrary, FTC Oklahoma staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. Their failure to do so was patently outside of their discretionary function.

179.  Plaintiffs' injuries were direct and proximate consequences of Defendant United States'

(a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R.

§ 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between

BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and

promote BOP personnel who were suspected or alleged to have had improper sexual

contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory

measures rather than providing proper support and protection, 28 C.F.R. § 115.43;

(e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61; (f) failure to

protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure

to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R.

§ 115.71(a); and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

180.  Defendant United States's above-described acts and omissions were a direct and

proximate cause of Plaintiffs' injuries and damages herein.


### COUNT II – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

181.  Plaintiffs repeat and incorporate by reference every allegation contained in the preceding

paragraphs as if fully set forth above.

182.  The above-described acts and omissions of FTC Oklahoma personnel, acting as an agent

of Defendant United States, constituted extreme and outrageous conduct.

183.   Defendant United States, individually or through its agents, servants, contractors, and/or employees, directly caused, or disregarded a substantial probability of causing, severe emotional distress to Plaintiffs.

184.   Defendant United States of America was negligent in its oversight and administration of FTC Oklahoma, which was a direct and proximate cause of Plaintiffs' injuries.

185.   The acts and omissions of Defendant United States, described above, physically endangered Plaintiffs and caused their injury through the sexual abuse they suffered, and caused debilitating emotional suffering. These acts and omissions constitute the tort of negligent infliction of emotional distress under the laws of the District of Columbia.

186.   Under the FTCA, Defendant United States is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

187.   As a direct and proximate result of the foregoing, Plaintiffs suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

188.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered serious harm, including, without limitation, physical, psychological, emotional, mental, financial,

and reputational harm, and therefore, Plaintiffs are entitled to recover damages in an amount to be determined at trial.

### COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

189.   Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

190.   Defendant United States's acts and omissions herein and the acts and omissions of its agents, servants, contractors, and/or employees constituted extreme and outrageous conduct, which caused Plaintiffs severe emotional distress following sexual abuse they experienced.

191.   Defendant United States, individually or through its agents, servants, contractors, and/or employees, intended to cause, or was recklessly indifferent to the probability of causing, Plaintiffs severe emotional distress.

192.   Plaintiffs, in fact, suffered debilitating emotional suffering. Their respective emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

193.   Harrison engaged in extreme and outrageous conduct through sexually abusing Plaintiffs while they were incarcerated and entirely under the care and control of Defendant United States. He intended to cause them severe emotional distress, or was recklessly indifferent to the probability of causing such distress, when he sexually abused them while he was supposed to be providing custodial care.

194.  At all relevant times, Harrison was acting within the scope of his employment at FTC Oklahoma and used his authority as a member of the facility's correctional staff to sexually assault Plaintiffs, while Plaintiffs did not have the ability to consent or withhold consent.

195.  Plaintiffs' injuries and damages were caused, in whole or in part, by intentional torts (*e.g.*, intentional infliction of emotional distress, gender violence, sexual assault, and battery) perpetrated by Harrison. Under 28 U.S.C. § 2680(h), Defendant United States is liable for the intentional torts committed by Harrison, and his abuse of his position of authority as a correctional officer and united manager, within the scope of his employment and under color of federal law.

196.  At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees, including Harrison, was acting under color of authority as "law enforcement officers" within the meaning of 28 U.S.C. § 2680(h). At all relevant times, Harrison supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and imprisoned Plaintiffs within the scope and course of his employment with Defendant United States. All BOP employees are charged with maintaining security of the institution, and staff's correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.

197.  At all relevant times, Defendant United States individually or through its agents, servants, contractors, and/or employees including Harrison, used their authority as law enforcement officers to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass, abuse, and assault Plaintiffs and to prevent them from disclosing the sexual assaults for fear of retaliation, victim-blaming or -shaming, and additional assaults, among others.

198.  Defendant United States is vicariously liable for the intentional torts committed upon the Plaintiffs. Thus, Plaintiffs bring this Claim for intentional infliction of emotional distress under the FTCA against the United States, based on the conduct of its officers, including Officer Harrison.

199.  As a result of FTC Oklahoma personnel's use and abuse of their positions of authority as "law enforcement officers" within the course and scope of their employment, and as a direct and proximate result of the foregoing, Plaintiffs suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

200.  As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered serious harm, including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiffs are entitled to recover damages in an amount to be determined at trial.

## COUNT IV – SEXUAL BATTERY UNDER FEDERAL TORT CLAIMS ACT
## (AGAINST DEFENDANT UNITED STATES OF AMERICA)

201.  Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

202.   Harrison committed sexual battery on Plaintiffs. It was impossible for Plaintiffs to provide

consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee

knowingly engages "in a sexual act with another person who is 1) in official detention; and

(2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

203.   Harrison acted within the scope of his authority and employment as a federal employee in

the administrative unit at FTC Oklahoma.

204.   Plaintiffs reasonably believed that Harrison was in a position of control or authority, and

they did not have the ability to consent or not consent to sexual acts that he initiated.

205.   With the intent to cause harmful or offensive contact, Harrison subjected Plaintiffs to

sexual acts to which they could not consent. These acts were deeply offensive to their

personal dignity and would offend a person of ordinary sensitivity.

206.   These above-described acts and omissions were a direct and proximate cause of Plaintiffs'

serious physical and emotional harm.

207.   As a direct and proximate result of the foregoing, Plaintiffs suffered debilitating

psychological trauma, excruciating pain and suffering, emotional distress, permanent and

catastrophic psychological injuries, permanent physical ailments associated with

psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment

and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as

attendant damages, both general and special, including, but not limited to, any past and

future medical expenses and economic injuries.

208.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered serious

harm, including, without limitation, physical, psychological, emotional, mental, financial,

and reputational harm, and therefore, Plaintiffs are entitled to recover damages in an amount
to be determined at trial.

209.  Defendant United States of America is liable for the intentional torts committed by

Harrison and his abuse of his position of authority as a correctional officer within the scope

of his employment.

## COUNT V – NEGLIGENT SUPERVISION UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

210.  Plaintiffs repeat and incorporate by reference every allegation contained in the preceding

paragraphs as if fully set forth above.

211.  Defendant United States hired Harrison and other abusive employees, and allowed them

to use their positions of power within the facility to exert influence over prisoners such as

Plaintiffs.

212.  Defendant United States knew that potential abusers such as Harrison would have the

opportunity to be alone with female prisoners, particularly in secluded areas and areas

without other facility personnel or video surveillance.

213.  Defendant United States failed to properly oversee and administer FTC Oklahoma, and

failed to properly implement BOP and PREA policies that would have deterred sexual abuse,

such as that suffered by Plaintiffs.

214.  Defendant United States had knowledge of the threat of future sexual abuse posed to

prisoners as committed by facility staff, through the reports mentioned above and lawsuits.

215.   Defendant United States's knowledge of prior sexual abuse at FTC Oklahoma, as well as
that specifically by Harrison, placed it on notice of employees' propensity to engage in
sexually abusive behavior with prisoners such as Plaintiffs.

216.   If Defendant United States had properly supervised employees, facility staff such as
Harrison would not have been able to sexually abuse prisoners.

217.   If Defendant United States of America had conducted thorough investigations of reported
employees, Harrison would not have been able to continue sexually abusing prisoners,
including Plaintiffs.

218.   Defendant United States was also negligent in allowing employees, who it knew had
previously committed sexual abuse, to continue to safeguard and monitor a female
population of prisoners.

219.   If Defendant United States of America had properly supervised and investigated
employees such as Harrison and his supervisors, it would have learned of his propensity to
commit sexual abuse.

220.   The above-described acts and omissions were a direct and proximate cause of Plaintiffs'
serious physical and emotional harm.


### COUNT VI - Trafficking Victims Protection Reauthorization Act ("TVPRA"),
### 18 U.S.C. § 1581, *et seq.*
### (AGAINST DEFENDANT REESE)

221.   Plaintiffs repeat and incorporate by reference every allegation contained in the preceding
paragraphs as if fully set forth above.

222.   Congress passed the Trafficking Victims Protection Act and subsequent reauthorization
acts ("TVPA") to combat domestic human trafficking.

223.  TVPA is a comprehensive statutory framework imposing both criminal and civil liability, *see* 18 U.S.C. § 1595, of persons engaging or attempting to engage or benefit from sexual exploitation and labor trafficking or obstructing anti-trafficking enforcement.

224.  The TVPA makes liable anyone who attempts to, conspires to, or actively "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or . . . benefits, financially or by receiving anything of value, from participation in a [trafficking] venture" while knowing "that means of force, threats of force, fraud, coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a); 18 U.S.C. § 1594.

225.  "Coercion" means "threats of serious harm to or physical restraint against any person . . . any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person" or "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2).

226.  "Serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

227.  The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another

person to cause that person to take some action or refrain from taking some action. 18 U.S.C. § 1591(e)(1).

228.   A commercial sex act is "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

229.   Additionally, the TVPA punishes anyone who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means:

    a.   by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    b.   by means of serious harm or threats of serious harm to that person or another person;

    c.   by means of the abuse or threatened abuse of law or legal process; or

    d.   by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a).

230.   The TVPA makes liable anyone who knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d). 18 U.S.C. § 1589(b).

231.   The term "abuse or threatened abuse of law or legal process" in the forced labor provision means "the use or threatened use of a law or legal process, whether administrative, civil, or

criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1).

232.  The term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(12).

233.  The TVPA also punishes anyone who "obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section," 18 U.S.C. § 1591(d).

234.  The TVPA allows for civil liability as set forth in 18 U.S.C. § 1595(a).

235.  An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees. 18 U.S.C. § 1595(a).

236.  Congress grants a plaintiff up to ten years in which to bring a civil action under 18 U.S.C. § 1595(c).

237.  Harrison made Plaintiffs engage in sex acts through force and coercion.

238.  Defendant Reese, as Chief of the Office of Internal Affairs, knew or should have known that Harrison had engaged in commercial sex acts with the Plaintiffs in violation of the

TVPA, and had a duty to protect prisoners, such as Plaintiffs, from reasonably foreseeable predators such as Officer Harrison.

239.  By her acts and omissions in failing to meet these duties, Defendant Reese benefited through continued employment.

240.  Defendant Reese participated in a venture and facilitated the harboring and transportation of Plaintiffs for purposes of sex induced by force, fraud, or coercion.

241.  Defendant Reese benefited financially through continuing employment and advancement when she, through her own actions and those she directed in her office, ignored the conditions that led to Harrison's persistent abuse, and otherwise benefited from facilitating this behavior that kept him in his role on the facility's medical staff.

242.  This conduct has caused Plaintiffs serious harm, including, without limitation, physical, psychological, emotional, financial, and reputational harm, and they have a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

**PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants, and each of them, as follows:

243.  An award of compensatory, punitive, and nominal damages to each named Plaintiff in an amount to be determined at trial;

244.   An award to Plaintiffs of the costs of this suit and reasonable attorneys' fees and litigation expenses; and

245.  For such other and further relief as this Court may deem just and proper.

Dated: December 5, 2025

Respectfully submitted by,


*/s/ Deborah M. Golden*
Deborah M. Golden
DC Bar # 470578
dgolden@debgoldenlaw.com

bex kolins
DC Bar # 90035779
bkolins@debgoldenlaw.com

Golden Law
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332